Good morning, Your Honor. I would like to reserve five minutes. Okay, we'll try to help you. Yes, thank you. And I will try to watch the clock. My name is Susan Stahlfeld, and I am here with Tara O'Hanlon from the Miller Nash, and we are representing the appellants in this case. The appellants are Bradley Boardman, who is a gentleman who is a healthcare IP, a healthcare provider, who provides care for his disabled sister in their home. He receives a modest income from being paid for Medicaid benefits. While he no longer has to pay union dues, he still is required to be a member of the bargaining unit. He would like to speak to the other members of the bargaining unit, as would our other individual appellants, Deborah Thurber and Sean and Ben. Again, they are childcare providers. Again, they are now relieved of the duty of paying money to the union, but they still, as childcare providers, are required to be members of the bargaining unit. With the healthcare IPs, it's SEIU 725. With the childcare providers, it's SEIU 925. Our other client is the Freedom Foundation, which is 501c3. That does a number of things, but among those, it communicates with public sector employees about their constitutional rights vis-à-vis the union. Prior to the passage of Initiative 1501, the Freedom Foundation and the appellants also were able to communicate with the IPs, who are quasi-governmental employees under the Harris decision in 2014. With the passage of 1501, however, they are effectively unable to communicate with the IPs with regard to anything, in particular with regard to this compelled membership within the bargaining unit of the two unions. Counsel, I respect the fact that you want to get the information about who these folks are, but what is it in 1501 that says that you can't communicate each of the things you'd like to communicate with them? There's nothing in there that says you may not speak to healthcare providers about this subject, does it? No, there is nothing like that in there. It doesn't say you can't associate with them. It doesn't say that you can't do all the things that the First Amendment would normally cover. The initiative doesn't seem to regulate speech. It doesn't say you can't do any of those things. It does not regulate it on its face, Your Honor, but what it did do was put a burden on the right to speak one-on-one. And I want to back just a little bit on here. Our Supreme Court has said that we must look at the effect of a regulation in the real and appreciable way it has in this reality situation. This is a unique situation because these people are scattered clear across the state. They don't even know who each other are and are not able to contact them or know who they are. Absent getting the information from the government, there is no other way to get that information. These are not cases, I'm thinking specifically of Los Angeles Police Department v. United Reporting and Hutchins v. KQED that disavow any government obligation under the First Amendment to disclose government information or records. Actually, Your Honor, this Court has already found that Hutchins does not say that there is no right. It says there is not a general right, but there is a limited right under certain circumstances. We believe these are the certain circumstances. And why is that so? Because of the unique circumstances of these people. They are required by the government to be associated with 45,000 strangers that are scattered across the state. They would like to be able to talk to those 45,000 strangers about this compelled association by the state in the bargaining unit. I didn't take your argument to be that the Foundation or anybody else has just an inherent First Amendment right to get this information, which would meet a lot of resistance from the cases that Judge Smith just referenced. I took your argument to be that what this statute does is essentially allow viewpoint discrimination by allowing certain people to get this information but others not to. That's what I understood your main position. There is both. It is the fact that it allows the union to get the information. It does not allow the appellants with the opposing point of view to get that information. That is part of it. If you had another union, I think you actually tried to do that, if you have another union or anybody else, they're not allowed to get that. I mean, it's not just limited to you. Nobody can get that information except the collective bargaining unit, right? Your Honor, I think you have to look at it in the context of when this came up. Prior to 1501, the only people that were seeking this information were my clients. Right. And it's undisputed that the union sponsored and financed this initiative for the purpose of stopping my clients from being able to speak to the union. I agree, but 70% of the people in the state of Washington who voted decided that it was a good thing. Just because the majority of the people like it doesn't mean it's constitutional, Your Honor. I get that, but I'm just saying there's no scienter, there's nothing of that nature. They weren't trying to discriminate against your First Amendment rights, were they? The union certainly wasn't sponsoring and financing. But the people who voted for 1501, how are you describing that to them? Well, Your Honor, certainly and even the campaign in the state admitted this, there were plenty of newspaper articles to the voters. There was also the voter's guide, which talked about the guide statement by my clients that talked about what the real reason was behind sponsoring of 1501. So the court could find that that was part of the motivation behind the voters in passing it. It's true the campaign did not say, oh, we're doing this to stop Freedom Foundation from speaking. Let's say that is, in fact, all that happened. How does that have a constitutional dimension in this case? Well, I would like to go back to the Meyer v. Grant case, which is the Colorado case, in which the state took away the right from the speakers to be able to pay the petition gatherers. They didn't on their face say, you may not have petition gatherers. They did not on their face say, petition gatherers may not speak to individuals. But what they did was they took a tool away that allowed that speech to occur. And as the court pointed out, that was an unconstitutional burden because it reduced the number of voices that could speak one-on-one with the intended audience. We just had a case involving the state of Arizona where we found illegal the ability of the state to limit picking up ballots and the like and throwing them out if they were after a certain number of days or an Indian tribe or things like that. I don't remember all the details, but I guess the bottom line is that there can be limits on what people can get the state to do, have the state permit. I just struggle with your issue here because I don't see where there's discrimination against your message. This is the day of the Internet. Can you put up a site that says, you know, everybody's working in the health care field. Look at this site. Does anyone want to tell you about this or take some TV ads out or something like that? No, I think you have to look at the decades of cases out of our Supreme Court that protect and emphasize the importance of one-on-one communications. Well, but just a minute. What is the case that I look at that invalidates a statutory public records exemption on the basis of free speech? I'm not aware of any case that looks specifically at a PRA. I would point the Court to its decision in Cal-Ullman where they talked about a FOIA request. But in Cal-Ullman, we found that the FOIA did not exempt the voter list from disclosure. We did not get to the constitutional question. So I looked at Cal-Ullman. I don't think it's there. So give me a case. I mean, the bottom line is I'm listening to what you're saying to Judge Smith. I'm trying to make this decision in a rational basis, but I have a tough time where the statutory public records exemption has no discrimination on the face thereof, was done exactly for the reason it was done is right in the statute. The statute required it to do what it had to do. And now I'm going to invalidate that because of free speech. Yes, Your Honor, because I think you have to look at it, what the effect was in the case. So I can get on to that case and say this is the one I ought to follow. There are two. The Meyer v. Grant case, which I was speaking of, was one. And two, I will go back to the Cal-Ullman. You're correct that that was in the end decided on statutory grounds. But I think the fact that this bench went through the whole explanation of the constitutional issues, even though it was deciding on statutory grounds. I mean, it could have said simply, we can decide this on statutory grounds and we're not even going to discuss the constitutional issues. The fact that there's a lot of good language in there that doesn't have anything to do with the real decision, I should seize on to that and say that's exactly what we got to say. I think that's very persuasive language. And, yes, Your Honor, I would encourage you to seize upon that language. I've never done that before, but I expect if that's what you want to argue. I think that argument there is something that I think is something this Court should look at. But I'll go back to the Meyer v. Grant case, which was, you know, where they made it a criminal violation to pay petition gatherers. Again, they didn't say you can't talk to one-on-one, you can't be in one place or another. There was no facial burden upon the speakers in that case. They could still have volunteers to go out and talk. But what the Court found was that by prohibiting them, pardon me, from taking away from them the right to pay those petition gatherers, they reduced the number of voices that could talk one-on-one. And, you know, I'll just quote from that case, that the Colorado regulation restricted access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. And that didn't meet the well-nigh insurmountable scrutiny. And that's why they found that it was a burden on First Amendment speeches. As Janice, the Court told us in Janice, everything public sector unions do is political and involves public issues. But Janice doesn't really say that collective bargaining is inherently political speech. Yes, actually they did. I don't think they do. Quote the language. I don't have that in front of me. It doesn't say that. I don't have that in front of me. Okay. I mean, I look for it, because it seemed to me that's what your argument was. And it's not there. It doesn't say that collective bargaining is inherently political speech, any place in Janice. I believe when you look at Janice and the Court talks about the fact that every time a union says to its public sector employer, you need to pay us more money, that impacts budgets, that impacts spending on other programs, it impacts public issues. So in fact this is speech, what scrutiny applies? It's strict scrutiny, Your Honor. Well, is this law not facially neutral? Yes, Your Honor. It doesn't provide or deny access to identifying information by drawing distinctions between individuals. It regulates only the form of the government's release of information, right? It releases not just the form, but the substance of the release of information. Based on viewpoint. It is when it was passed because it allowed the unions. Just a minute. If I look at this statute, there's nothing in there that releases it on viewpoint. It's released to those who the law already says should get the information. That's it. Then what it did is target my clients, the appellants, for the purposes of keeping them from speaking to the members of this collective bargaining unit. If, in fact, that's the case, why wouldn't I apply? I mean, I'm getting to the fact, why isn't O'Brien applicable? It was facially neutral and only incidental burden on speech. That was the intermediate scrutiny of O'Brien. Why isn't that applicable? O'Brien says that this is the great burden. It's okay if it furthers an important or substantial government interest. If the government interest is unrelated to the suppression of free expression and if the incidental restriction on free first amendment is no greater than is essential to the furtherance of that interest. Then that is your answer to your question, Your Honor. And that's exactly what's here. Your Honor, the prohibiting the giving of the names is not essential, which is all that my client ever asked for was the names of the IPs, not all the other identifying information. They sought the names of the IPs. Well, giving the names to the people who are giving them is essential to the furtherance of the statute. That's exactly what the statutes in Washington. These are the only ones who can negotiate for these workers. They're the only ones statutorily allowed to negotiate with the government about them, and then they allow them to get the information. That's all there is. I read the essential thing being that the central part of 1501, which was I read it to the essential to the furtherance of the governmental interest in having the statute, which is 1501, and the essential interest of that is to get the information to those who are their bargaining representative. I would argue that the essential function of 1501 was to stop identity theft. That's what 1501 said it was trying to do was to stop identity theft. Well, let's say that it does. That is part of what it said. But does it play any role in that, or was it entirely scienter behind the whole thing? There was no benefit to the public in terms of helping to stop identity theft. There is no evidence whatsoever that there is any benefit to stopping identity theft by prohibiting the release of the names of the IPs, Your Honor. You have the fact that at the time that 1501 was being campaigned on, you had people who were fighting identity theft among seniors and so forth who refused to endorse it because it had nothing to do with protecting identity theft of the people they said it would do. 1501 did have, I want to spread this out, it had some provisions on criminal penalties. We aren't challenging those. But it's part of the whole text, though, right? It's part of the 1501. There are different sections of 1501, yes. The only public purpose of 1501 was to stop identity theft. And the identity theft of seniors and then said, and we're going to do this by not letting them know who their IPs are. I don't think that is essential furtherance to the instance of protecting identity theft. The people at the time who were experts said it was not. We have not, there is not a single evidence of any public records request leading to identity theft. And when you, particularly when you then throw in that you have a voter registration list which has people's names, addresses, dates of birth, sex, and anybody can go get that information just by saying, I won't misuse it. The state finds no problem with that as a protection against identity theft. They also say, they also allow, the union can get this information by promising it will maintain the confidentiality of it. That is enough to protect against identity theft. It was not necessary to keep the appellants from getting the names of the IPs to protect against identity theft, which was the function of 1501. Is it, was it a rational basis? Did it satisfy a rational basis if, if, if, if the, if the state in drafting this or the union, whoever did it, if it satisfies a rational basis, is that sufficient? If it did. As long as it on its face doesn't discriminate against viewpoint, doesn't prohibit you from communicating in a particular way. It is difficult to overturn a rational basis, Your Honor, I understand, but I don't think this even meets rational basis. Well, you don't think there's any rational, I thought you said that the union did it to protect itself. The union did it to protect Freedom Foundation from talking to the IPs about the union. So, is that not rational from their perspective? But that's not the base, that's not the, I understand that. That's not what the, the, but I guess my point is simply this. The, when a legislature or in this case the people acting in the legislature pass a law, it's almost academic that somebody, some special interest group, somebody is behind the law. It doesn't just, it's not, it's not a virgin birth. So the bottom line is whoever is behind whatever it is doesn't mean that the law is not rational. No, but if, if the underlying motivation was for the union to say we get to keep speaking to these people and appellants do not, that is more than rational basis review. That's got to be the higher, the higher basis of review. What case would you cite, again, as we've all discussed, on the face of it, none of the strict scrutiny are here. No restriction in the content of speech. This is a really tangential issue. Why is this not rational basis? And if it's rational basis, what's the problem? Your Honor, I would go back to Meyer again. If saying that you can't pay petition gatherers is so much of a burden that it is well nice, strict scrutiny, insurmountable scrutiny, to say, to take away from my clients the ability to identify the audience and speak on them one-on-one, then you, it is, requires strict scrutiny review. Do you want to save any rest of your time? I do. I would like to do that if you don't mind, sir. Thank you. Okay. Go ahead. All right. We'll hear from the government. Good morning, Your Honors. May it please the Court. Greg Wong for appellee campaign. With me at council table is Mr. Peter Gonick, who's representing the state appellees. We're dividing our time. I will take eight minutes to address why this court should affirm based on the right to government information cases. And Mr. Gonick will take 12 minutes to address why this court should affirm should this court get to the First Amendment and 14th Amendment issues. This case concerns whether the people of Washington violate the Constitution when they exempt an additional category of government information from public disclosure. And the answer is no. And Your Honors have touched on the key issue here already. The Supreme Court has set forth a rule that distinguishes between a law or policy that impacts access to government information and the use of that government information to carry out or exercise constitutional rights. In the McBurney case, Justice Alito, speaking for a unanimous Supreme Court, stated the rule well. He said this court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA. So let me, I think that's pretty well established, and so I agree with you. But the problem here is that the statute on its face says that the union is allowed to get this information, all of it, and nobody else is allowed to get any of it. And so the issue that this raises is not just access to information but whether the government is discriminating in making that information available. So I take it, do you agree at least that that states a First Amendment claim, that theory is a cognizable First Amendment theory? It's a cognizable First Amendment theory in that you must examine and see why is it that one entity may be able to receive information and another entity may not. And here the claim, again, as Your Honor pointed out, the claim of the Freedom Foundation is that this is viewpoint discrimination. It's allowing one entity that has a certain viewpoint in their view, the incumbent union, to be able to access information and denies it to the Freedom Foundation, who wants to use it for their own political purposes. And first, there is no viewpoint at all that's at issue here. This is not a pro-union or anti-union speech that is either favored or discriminated against. For example, Fuse Washington, which is a nonprofit that the Freedom Foundation has identified as being very pro-union and, in fact, was part of the campaign to vote yes on 1501, if they made the exact same request for public information that the Freedom Foundation did, the answer would be the same. No. That doesn't really get at the problem with this law, right? The problem with the law is that it allows the union's viewpoint to be presented by allowing them vastly superior access to the identities of the home providers. And so it doesn't really matter that Fuse or anybody else is not allowed. The point is it's essentially a subsidy to the unions to be able to promote their speech. That's how it works in operation and effect. Well, I think that that's not the case here. And I'd point the court to the Perry case where the Supreme Court looked at differential access to workers in a collective bargaining unit between an incumbent union and then a rival union, which is essentially the situation we have here. And the Supreme Court said that was not a constitutional issue because the distinction was based on the status of the union. Right, but as you point out in your brief, that's really a public forum case. So, you know, if the state were to host a conference for home providers and they invited the union to come in but they didn't invite the Freedom Foundation to come in, I think there's a whole different set of considerations at play here. But that's not this case. This is about access to government information. So I don't think Perry really answers that question. Well, I think the rationale of Perry when it looks at it, and Your Honor is correct, that it is a public forum case. But the rationale on why the distinction is made, and there was a viewpoint discrimination claim in that case, is because of the unique status of an incumbent union. An incumbent union has statutory duties under the law to represent all of the workers in the collective bargaining unit, regardless of whether or not those workers are members, regardless of whether or not they pay dues. They have an obligation. There's a question of how could they adequately represent those workers if they can't communicate with them. The access here is simply to information so that they can know who is within their bargaining unit and communicate with them. That may be. But the problem is, of course, that it excludes other people from getting access to it as well. And so there may be a good argument that the union needs this information to be able to communicate with its members, and that could be given effect through a state law. But this not only gives the unions access to this, but it denies it to everybody else. That seems to be the central issue here. Well, I think there's two cases. I'd bring Your Honor's attention on that. The first one is to think about the Janus case. And Your Honor used the term subsidy of speech. At issue in Janus was whether or not the non-members had to pay agency fees, and the Supreme Court was concerned that that would be a subsidy, a compelled subsidy of speech. At the same time, the Supreme Court noted that incumbent unions are granted and have special privileges, is the term the Supreme Court uses. And those special privileges include accessing information about the workers in the unit, and it cites to the Illinois law. And if you look to that provision of Janus, Illinois law, if you look at it, it's a very broad category of information that is available to the incumbent union, including their contact information. But I did look at the law. And the difference, though, is that although that law gives the union an ability to access this information and perhaps even an ability to access it more easily, it doesn't deny that information to everybody else. And so that, are you aware of any law like the state of Washington law that allows the incumbent union to have access to the identities of the employees but doesn't allow anybody to have any other access? Because the Illinois law is much different than this Washington law. Well, in terms of access to information, I think that this, the Public Records Act issue, is the law that governs that for access to union information. The second case, though, I think that is relevant here is the Los Angeles Police Department case. And in that case, the California Public Records Act was at play, and you had a commercial entity that had access to information about recent arrestees. This was the names, the contact information of people who had been recently arrested. Not easily to know information. They had been using that information in order to connect those recent arrestees with lawyers, with counselors. It was a business for them, a referral business of a type. California amended its public records law so that that recent arrestee information was not available. Yeah, no, we know the case. I mean, so what's, but what do you take from that case? Because I think insofar as the petitioners or the plaintiffs here are making a facial challenge, then that case presents some issues for them. But I don't read them to be making that challenge. They're making an as-applied challenge. And so this sort of gets into the question left open by LAPD, by United Reporting. So I'm not sure what the case does for you other than that. Well, I think the case has two things that are interesting. One is that it does differentiate between commercial speakers, a constitutionally protected form of speech, and allowing the information generally to be made public. There is five broad exceptions in the law, as your honors know. And so that information on recent arrestees was available out there in the public, just not for certain purposes. And so it did distinguish based on the use. And if your honors look at Justice Stevens' dissent, where Justice Stevens did say there was an as-applied challenge in LAPD, even under that analysis as as-applied, he agreed with the majority that it was still an access to government information case, and therefore did not even go into a central Hudson balancing analysis to determine whether or not there was a First Amendment violation. Let me ask you this. What are we supposed to do with the evidence in the record that the foundation came forward with, these internal e-mails, e-mails sent to the governor's office and other documents that I think even the district court acknowledged pretty clearly on their face indicate that an intention of people who were pushing this initiative was to silence the foundation's advocacy? What are we supposed to do with that evidence? Well, I think the answer to that is that even assuming all that's true, and even assuming that that was the intent of the unions behind proposing the law, it does not actually make a substantive difference in the outcome of this case. And that's because there's not even an allegation in the complaint that the people of Washington, the enactors of the law, acted with any animus. Courts, when they're looking at animus, first look to the text of the law itself, nothing in 1501 demonstrates animus within the text. And when they look beyond the text, they look to the intent of the enactors. It's acknowledged that it would be very difficult to ascribe some sort of group-wide animus to an entire population of voters, but when you're looking at a law that on its face gives one speaker access to information and nobody else, and when we know from Janice that the speaker who has the information is not an apolitical entity, when you have that coupled with all this evidence that the real motivation was to put limits on what the foundation and other people were doing, are you suggesting we just turn a blind eye to all that? Well, I'm suggesting that going back and looking at why any particular law is proposed would create significant issues for the courts to administer. I mean, as your honors know, most laws at the state level, at the federal level, they're proposed by some interest. It could be a lobbyist. It could be an industry group. They draft laws. They propose them. What those lobbyists, what those funders, what those special interests have in mind when they're trying to get that law enacted, whether it's a benefit to them or perhaps something that would hurt their competitors, that is never a level of inquiry that the courts go to. They look only to what were the enactors trying to do, and that is the precedent that I would point you to that should control here. The rule in government information cases is that you don't go to the First Amendment analysis if you're looking at whether it's just denial of government information. I take it. I mean, if the government here, if the law had just allowed only one political party access to this information and disallowed everybody else, I think you'd agree that that law is not going to pass constitutional muster. Is that fair? That's absolutely fair, sure. Okay. And I mean, if the statute here had given, let's just say the Freedom Foundation, if it said only the Freedom Foundation can gain access to these provider identities but nobody else can, would you think that would be okay? I think you'd have to look and say, why is it that the distinction is made? Again, Justice Stevens in the LAPD dissent says that a law that generally prohibits access to government information but allows for reasonable, limited, and justified exceptions poses no constitutional issue. And that was in his dissent. The majority had already agreed there was no constitutional issue. So you'd have to look and say, why is the Freedom Foundation being granted access to the records of no one else? Here, incumbent unions have statutory duties to fulfill. They have a unique place. The Janus Court recognized that, did not see those special privileges as in the same opinion where they're talking about subsidies that are impermissible under the Constitution. They ruled those subsidies were unconstitutional by looking to the other types of special privileges unions receive and not raising any issue with those as well. Your Honors, I see I'm much over my eight minutes, and so I'd like to defer some time to Mr. Argonik here. Thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court, I am Deputy Solicitor General Peter Argonik, representing the Washington State Dependents. As my colleague has shown, the Initiative 1501 does not implicate free speech rights at all, and summary judgment should be affirmed on that basis alone. But even if a free speech analysis were to be applied, Freedom Foundation has failed to show a violation. As has been discussed already some, the initiative does not discriminate based on viewpoint, furthers a substantial government interest, and otherwise does not violate equal protection or freedom of association. On the question of viewpoint discrimination, this initiative does not just give the information to the unions and to nobody else. In fact, there are other exceptions that basically, if you look at those exceptions, evince the intent to not have this information widely available to the public in order to serve its purpose of protecting vulnerable individuals and their caregivers, but recognizing that there were some circumstances really for the government to function in which the information had to be disclosed, if a contract required it, if federal law required it to give it to residential care facilities, to give it to, yes, the unions. And in that same exemption, it states it gives it to the unions or, as necessary, to provide fringe benefits to employees. So the initiative sets forth various exemptions that all relate not to any particular viewpoint or political position that those entities might entertain, but instead to the roles that they play in administering the system. And that's exactly what the Perry Court did address, that my colleague discussed at some point. There, the United States Supreme Court looked at the question of whether or not giving access it was a public forum case, Your Honor, that was correct, but whether giving preferential access to the incumbent union and denying it to a rival union was viewpoint discrimination. And although there are aspects of that opinion that are not applicable here because it is a public forum case, that aspect of its opinion was distinct. They first addressed, well, let's first determine whether there's viewpoint discrimination here because that's going to impact the level of scrutiny that we're going to apply. And the court held that, in fact, they viewed that not as discriminating on the basis of viewpoint but rather on the basis of the status of the union. I mean, you're right. There's passages in that opinion that say there's no evidence of viewpoint discrimination associated with the policy. But do you agree that's the case here? There's no evidence of viewpoint discrimination given all these documents that we have in the record that do on their face say people should pass this law to limit what the Freedom Foundation can say? I would say, Your Honor, that there's no evidence of viewpoint discrimination on behalf of the people who enacted the legislation. And, in fact, there's not even an allegation in the complaint that the people acted out of an animus to prevent the Freedom Foundation from contacting these individuals. That's going to be true in probably every case involving a ballot initiative because it would be a very hard thing to say that an entire populace was discriminated against. And the fact that you have an amendment, a First Amendment, which is designed to protect minority rights, it is obviously implicated in the situation in which the majority has decided that there's going to be some restrictions like the kind we have here. I agree, Your Honor. There may be some additional obstacles to determining legislative intent when we're talking about an initiative as opposed to the Supreme Court and, indeed, all courts have examined the question of the animus of an initiative or even of a legislative act. They have looked at situations not just in which a sponsor or an individual legislator or the proponents or the financial backers may have had an ulterior motive. Identity thefts, was there any? I'm not aware of any records that would suggest, in other words, a reported case of somebody using a public records request to obtain information, but that kind of information would be extremely difficult to hold. And, indeed, the public records laws also exempt information such as social security number and other information such as that. I'm not aware of any case where a public records request was used to obtain a social security number in order to then commit identity theft or other financial fraud. Nevertheless, it is entirely rational to say that we don't want to disclose that information because it could lead to identity theft or other financial crimes. Well, if we get the viewpoint, let's supposing that there is a viewpoint discrimination here, then what would the scrutiny, what scrutiny would we apply? I think, Your Honor, if we were talking about a different statute such as the hypothetical provided that if information was provided to the Libertarian Party and no other party, that was viewpoint discrimination, it would be a strict scrutiny analysis. But supposing that we find viewpoint discrimination here, what scrutiny should we apply? I think it would also be strict scrutiny, Your Honor. If it's a viewpoint discrimination, then the cases are pretty clear that... So the government is resting on the fact that this is not viewpoint discrimination, and if it is, then it will be strict scrutiny, period. Yes, Your Honor, we are relying on the U.S. Supreme Court that states that it's not... I understand. The only thing that I'm trying to figure out is I looked at the O'Brien case where it says it furthers an important or substantial government interest. If the government interest is unrelated to the suppression of free expression, and if the incidental restriction on the First Amendment is no greater than is essential to the furtherance of that interest, then we would apply a different test. And we agree that the O'Brien test is one that should be applied here in the event that the court determined there was any incidental infringement, which I don't think is the case. But the O'Brien case is somewhat instructive because that case, of course, was about the law passed prohibiting the drafting... Excuse me, the burning of draft cards, which at the time was clearly political speech. And even though the statute clearly did have that incidental infringement on that political speech, which we would contend is certainly more like viewpoint discrimination than this statute. I asked your co-counsel this, but are you aware of any other statute like Washington's? I've seen ones that give the incumbent union some preferred access, some specialized access. But how about one like this that gives the incumbent unions all the information about the identities of the employees, but doesn't allow anybody else to have it? I'm not aware of a specific statute, Your Honor. I would be very surprised if the other states did not provide this information to the unions, because I think it is certainly required by labor law, perhaps required constitutionally to provide this information to an incumbent union. And so if there were more general confidentiality laws in those states that did not allow that kind of information to be disclosed, I think nevertheless they would be requiring that to the unions. Providing this to the unions. But you're not aware of a law like the one Washington has? I am not, Your Honor. Okay. Other questions by my colleagues? All right. Thank you both. Thank you. We have a little rebuttal time, counsel. I'm going to address really for the comments on the Perry case and viewpoint discrimination. I think it was really critical to the analysis of the case. The Perry case was a case where the school district allowed the union to have access to the official mailboxes for, frankly, either union to use for union advocacy reasons, as opposed to communicating the official work of the union. The school district allowed the rival union to be in classrooms, to use the public speaker system to get its message out, allow them to be on site, to hand out their messages, their political messages. Even in Perry, though, the incumbent union could not use those mailboxes to advocate its position for continued, to continue to be the representative. And I think that also plays into what we have here with the state is telling these people, you're going to have to be a member of this bargaining union. We're going to give you this 30-day process where you can identify 30% of the people to change your representative or to certify the representative, but we're not going to tell you who those people are. So you have, in effect, it's an illusory right to be able to change your representative at that point because you'd need to be able to communicate with those bargaining unit members. The union has that right to communicate, and my clients, the appellants, do not. So I think that that's where Perry plays in that is of most interest. I'm down to like 20 seconds. Are there any questions that I can answer for the court? Thank you so much. I appreciate your time. We thank all counsel for their argument. This is obviously an interesting case, a challenging case. The case just argued is submitted, and the court stands in recess for the day.
judges: M. Smith, Jr., N.R. Smith, Bress